Matthew I. Knepper, Esq.
Nevada Bar No. 12796
Brenden J. Gougeon, Esq.
Nevada Bar No. 16874
**NEVADA BANKRUPTCY ATTORNEYS, LLC**
5940 S. Rainbow Blvd., Suite 400
PMB 99721
Las Vegas, NV 89118
Phone: (702) 805-1597
FAX: (702) 850-2192
Email: mknepper@nvbankruptcyattorneys.com
*Attorneys for Debtor*

E-FILED: 06/27/2025

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>MSHINGES.COM,<br><br>Debtor. | Case No: 24-15588-abl<br><br>Chapter 11<br><br>Adversary No.: 25-01151-abl |
| MSHINGES.COM,<br><br>Plaintiff,<br><br>v.<br><br>PMC FINANCIAL SERVICES GROUP, LLC,<br><br>Defendant. | **DEBTOR'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Hearing Date: OST Requested<br>Hearing Time: OST Requested |

MSHinges.com, LLC (the "Debtor") hereby moves on an emergency basis for an order enjoining secured creditor PMC Financial Services Group, LLC ("PMC") from proceeding with a foreclosure sale of the Debtor's real property located at 2937 N. Lamb Blvd., Las Vegas, NV 89115 (the "Property"), which is currently scheduled for July 1, 2025. This relief is urgently needed to preserve the Debtor's business and estate. Accordingly for this reason and those stated immediately below, the Debtor brings this emergency motion pursuant to 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure 7065, which incorporates Federal Rule of Civil Procedure 65.

Absent an injunction, PMC's imminent foreclosure will irreparably destroy the value of the Debtor's estate – including the Debtor's ongoing operations, its pending backlog of customer orders, work-in-progress, and associated receivables – and will eliminate any prospect of a successful reorganization. By contrast, preserving the status quo through the end of 2025 will allow the Debtor to consummate its proposed Master Services Agreement ("MSA") with its affiliate, Aircraft Hinge, Inc. ("Aircraft Hinge"), and thereby realize the going-concern value of the business for the benefit of all creditors (including PMC) and stakeholders.

The Debtor and Aircraft Hinge have an interlocking relationship: Aircraft Hinge handles the sales and customer contracts for specialized aerospace and defense parts, while the Debtor performs all manufacturing and production at the Debtor's Las Vegas facility. Aircraft Hinge collects the revenue from customers and, in turn, funds the Debtor's operating expenses. In essence, the two companies function as a single integrated enterprise – Aircraft Hinge generates demand, including over $5 million in purchase orders currently backlogged for future production, and the Debtor fulfills that demand by producing the parts.

The Debtor's proposed MSA will formalize this arrangement, ensuring that the estate captures the economic value of the backlog, accounts receivable, and work-in-progress ("WIP") by providing manufacturing services to Aircraft Hinge in exchange for payment. Through this mechanism, the Debtor anticipates being able to fund a plan or sale process that will pay creditors, including PMC, more than they would receive from a foreclosure sale of the Property.

Unless this Court intervenes, PMC's foreclosure will proceed on July 1, 2025 – effectively snuffing out the Debtor's business overnight. The Property is the Debtor's sole manufacturing facility and houses the specialized machinery, inventory, and workforce essential to its operations. Foreclosure would shut down production, causing the Debtor to breach outstanding orders (destroying the value of the $5 million backlog), terminate its employees, and lose the benefit of its unique industry certifications and goodwill. In short, the Debtor's going-concern value would be replaced by a piecemeal liquidation value, likely consisting of a forced sale of the Property and auction of equipment – an outcome that would irreparably harm the estate and all creditors other than PMC.

Moreover, the public interest would be disserved: the Debtor is one of only a handful of companies in the nation capable of manufacturing certain critical aircraft hinge components, some of which are directly tied to U.S. national security. In one notable example, the Debtor was engaged by the U.S. Air Force to fabricate an emergency replacement hinge for a B-52 Stratofortress bomber because no other company had the ability and equipment to produce the part on the urgent timeline needed. Allowing this business to be destroyed by foreclosure would not only harm the Debtor and its creditors, but also deprive the defense and aerospace industry of a vital supplier – a result contrary to public policy. All requirements for injunctive relief under § 105(a) are satisfied here. The Court's equitable powers under § 105(a) permit it to issue any order "necessary or appropriate to carry out the provisions" of the Bankruptcy Code, including a preliminary injunction to preserve the estate. In considering such relief, courts balance the likelihood of a successful reorganization against the relative hardships and consider the public interest.

An objective weighing of these factors compels granting the injunction: the Debtor has a realistic opportunity to reorganize or sell its business as a going concern if given time (and thus a strong chance to maximize value for creditors), it will suffer irreparable injury absent an injunction (whereas PMC will suffer only minimal prejudice from a brief delay), and the public interest favors sustaining an ongoing enterprise and the prospects of a successful Chapter 11 outcome. The sole purpose of the requested injunction is to preserve the estate and maintain the status quo while Debtor seeks the Court's approval of the MSA pursuant to Section 363, and Debtor proceeds to plan confirmation; these proceedings will definitively determine the path forward for this case. Accordingly, the Debtor respectfully requests that the Court issue an order enjoining PMC from conducting its foreclosure or otherwise enforcing its remedies against the Property and related collateral through December 31, 2025 (or until further order of the Court), thereby allowing the Debtor a final opportunity to unlock the value of its business for the benefit of all stakeholders.

This motion is supported by the Declaration of Douglas Silva in Support of Debtor's Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief ("Silva Decl.") and the exhibits attached thereto.

## MEMORANDUM OF POINTS AND AUTHORITIES

I. **BACKGROUND**[1]

   A. **The Debtor's Business and Its Relationship with Aircraft Hinge**

      The Debtor operates a specialized manufacturing business in the aerospace and defense industry. Since 2006, the Debtor has continuously operated out of the Property – a 7,934 square-foot industrial facility in Las Vegas housing the Debtor's production line and equipment. The Debtor's principal and sole shareholder, Douglas Silva, also owns a related company, Aircraft Hinge, Inc. ("Aircraft Hinge"), based in California. Aircraft Hinge historically manufactured and sold aerospace hinges, but in recent years it has transitioned to focus primarily on sales and customer relationships, while outsourcing all manufacturing to the Debtor's facility in Las Vegas.

      In effect, Aircraft Hinge serves as the front-end sales arm, and the Debtor is the production arm of a unified enterprise. Aircraft Hinge maintains the customer contracts (including government and commercial aerospace clients), collects all payments from customers, and then pays the expenses needed to maintain the Debtor's operations. This symbiotic arrangement allows the Debtor to devote itself to manufacturing highly specialized hinge components to exacting industry standards (including military specifications), while Aircraft Hinge leverages its certifications and customer approvals to bring in new orders.

      As a result of this intercompany structure, the economic value of the Debtor's estate is inextricably linked to Aircraft Hinge's ongoing business. Notably, Aircraft Hinge currently holds in excess of $5 million in purchase orders ("POs") for aerospace parts that are to be manufactured by the Debtor. These pending orders (a "backlog" of future work) represent significant future revenue. In addition, under the MSA,[2] the Debtor will acquire approximately $225,000 in accounts receivable for completed work[3] and

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109–8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("FRCP.").

[2] Silva Decl. at ¶ 14(a).

[3] *Id*. at ¶ 14(c).

approximately $480,000 in work-in-progress on the shop floor[4]. Although there is some overlap in the POs identified to the WIP, AR, and Backlog schedules, it is de minimus.

Most of these assets did not exist as of the Debtor's Chapter 11 petition date in October 2024; rather, they have been generated through the Debtor's post-petition efforts to reinvigorate operations and rebuild its production pipeline. The Debtor's recent performance is markedly improved from the pre-petition period, with new orders flowing and production accelerating to meet demand.

Aircraft Hinge itself has likewise experienced a resurgence, evidenced by its current backlog and a cash reserve of about $195,000 on hand,[5] all of which will flow to the Debtor under the MSA. Importantly, Aircraft Hinge possesses numerous valuable industry credentials – including a coveted DLA CAGE Code and certifications (such as AS9100) and approvals from major aerospace customers (Boeing, Lockheed Martin, Airbus, the U.S. Department of Defense, etc.) – which enable it to bid on and secure high-value contracts. Aircraft Hinge also owns the technical drawings, software licenses, and intellectual property related to the hinge products, ensuring that the Debtor has the necessary designs and specifications to manufacture the parts.[6]

In short, the Debtor and Aircraft Hinge together form a going concern with substantial present and future value, so long as the Debtor can continue operating.

### B.     PMC's Secured Claim and Foreclosure Efforts

PMC is the Debtor's primary secured creditor, asserting a lien on substantially all of the Debtor's assets, including the Property, equipment, inventory, and accounts. The PMC loan originated in 2011 with Aircraft Hinge as the original borrower, and the Debtor (along with Mr. Silva personally) later became co-borrowers or guarantors through subsequent loan modifications and forbearance agreements. To secure the obligations, the Debtor granted PMC a Second Deed of Trust on the Property in 2017, and PMC holds blanket security interests in both the Debtor's and Aircraft Hinge's personal property. Mr. Silva provided a personal guaranty as well.

By mid-2024, the loan was in default (initial default occurred in 2020), and PMC recorded a Notice of Default on June 18, 2024. PMC initially scheduled a foreclosure sale of the Property for

---

[4] *Id.* at ¶ 14(b).
[5] *Id.* at ¶ 35.
[6] *Id.* at ¶¶ 42-43.

October 28, 2024. The Debtor filed its Chapter 11 petition on October 25, 2024, just one business day before that sale, thereby invoking the automatic stay to halt the foreclosure.

During the early months of this Chapter 11 case, the Debtor focused on stabilizing operations and did not immediately propose a plan or sale, leading to PMC's motion for relief from the automatic stay. On April 2, 2025, after briefing and a hearing, the Court granted PMC relief from stay under 11 U.S.C. § 362(d), allowing PMC to proceed with its state-law foreclosure remedies on the Property. The Debtor promptly filed the Reconsideration Motion under Bankruptcy Rule 9023 (incorporating Fed. R. Civ. P. 59) to seek relief from that order, arguing that significant new evidence of the Debtor's post-petition operational improvements and asset growth warranted reconsideration. The Reconsideration Motion was heard on June 25, 2025, and is currently under submission (no order has yet been entered as of this filing). Meanwhile, PMC has noticed a foreclosure sale for July 1, 2025, now that stay relief has been obtained.

Concurrently, the Debtor has been pursuing a strategy to monetize its business as a going concern for the benefit of the estate. To that end, the Debtor negotiated the aforementioned Master Services Agreement (MSA) with Aircraft Hinge, which is incorporated into the Debtor's forthcoming § 363 Motion. In essence, the MSA/Sale would transfer or assume certain economic rights between the Debtor and Aircraft Hinge so that the Debtor's estate directly benefits from the fulfillment of Aircraft Hinge's backlog and future orders. This transaction (subject to Court approval) is expected to generate the funds necessary to pay secured creditors (including PMC) in full or substantially in full over time, while also providing for the Debtor's other creditors and the continued employment of its workforce. The Sale Motion is set for hearing on [pending hearing date, if any], and the Debtor anticipates that, if approved, the MSA arrangement will be implemented expeditiously, yielding the cash flow and profitability needed to reorganize or conclude a going-concern sale by the end of 2025.[7]

In summary, the only obstacle that could preclude the Debtor from realizing this value for the estate is PMC's impending foreclosure. If the Property and equipment are lost on July 1, the Debtor's operations will grind to a halt, the Aircraft Hinge backlog will be unfulfillable, and the value underlying the Sale Motion will evaporate. The Debtor files this Motion to prevent that catastrophic and irreversible

---

[7] *See generally Id.* at ¶¶ 14-25

outcome, and to preserve the Court's ability to decide the Reconsideration and Sale Motions on their merits without the case devolving into a chapter 7 liquidation in the interim.

## II.     JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and this is a core proceeding under § 157(b)(2)(A), (G) & (O). The requested relief is authorized by 11 U.S.C. § 105(a), which empowers the Court to issue orders necessary to carry out the provisions of the Bankruptcy Code.

Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.    ARGUMENT

### A. Equitable Grounds for Temporary Stay Pending Reconsideration

The issue before the Court is whether an injunction should issue to temporarily halt PMC's foreclosure and related collection actions to preserve the Debtor's estate and the possibility of a successful reorganization or sale. The Debtor submits that this question must be answered in the affirmative. With a foreclosure looming, the Debtor's entire reorganization effort – and indeed its ability to continue operating – hangs in the balance. Section 105(a) of the Bankruptcy Code empowers this Court to enjoin creditor actions that threaten the estate, and doing so here is necessary to carry out core bankruptcy policies, including maximizing the value of assets and facilitating the Debtor's fresh start through reorganization. The following sections set forth the legal standard for such relief and apply it to the facts at hand.

"Section 105(a) gives the bankruptcy courts the power to stay actions that are not subject to the 11 U.S.C. § 362 automatic stay, but 'threaten the integrity of the bankrupt's estate.'" *Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086, 1093 (9th Cir. 2007) (quoting *Canter v. Canter* (*In re Canter* ), 299 F.3d 1150, 1155 (9th Cir. 2002)) (footnote omitted) Congress clearly envisioned that section 105(a) would be available to issue an injunction on a case-by-case basis in situations expressly excepted from the automatic stay. *See* House Report at 175, 343, reprinted in 1978 U.S. Code Cong. & Admin. News at 6135, 6298 (Code grants courts "ample other powers to stay actions not covered by the automatic stay," including section 105(a), which require more careful review by the court). "Indeed, many courts recognize that injunctions under Section 105 can be used to stay creditor

activity even if that creditor had received relief from stay under Section 362(d)." *Lattin v. Midland Mort. Co. (In re Lattin)*, 461 B.R. 832, 834 (Bankr. D. Nev. 2011).

Accordingly, this Court may apply the well-established standard set forth in *In re Excel Innovations*: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent relief; (3) balance of hardships; and (4) the public interest. These elements operate on a sliding scale and support temporary relief even if success on the merits is uncertain, so long as serious questions are raised and the equities tip sharply in the movant's favor. 502 F.3d at 1093 (9th Cir. 2007) (citing *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1120 (9th Cir.2005)).

Here, the Debtor satisfies each element. Foreclosure during that pendency would irreparably destroy the Debtor's business, eliminating all chances of reorganization, and moot further judicial review. The requested stay is limited in scope and duration, imposes minimal prejudice on PMC, and serves the public interest in fair process and the orderly administration of Chapter 11.

Thus, while the outcome of the Debtor's pending Reconsideration Motion or any potential appeal is uncertain, this Motion rests on the broader and more fundamental equitable considerations authorized by § 105(a). As demonstrated below, those considerations strongly support the issuance of a preliminary injunction to maintain the status quo. The Debtor therefore requests that the Court temporarily stay enforcement of its May 6, 2025 Order [ECF No. 77] for the reasons stated above.

    **i. Substantial Likelihood of a Successful Reorganization or Sale if an Injunction Is Granted.**

The Debtor has a viable and promising path forward in this Chapter 11 case – but only if its business can be kept intact. With the benefit of the proposed MSA and the recent upswing in operations, the Debtor is positioned to either reorganize and resume profitability or to consummate a value-maximizing going-concern sale. In the past few months, the Debtor's fortunes have markedly improved: it has built up significant new assets (over $225,000 in receivables and $480,000 in work-in-progress as of late May 2025) and Aircraft Hinge has lined up more than $5 million in future orders that will flow to the Debtor for production. This influx of business is not speculative; the orders are real and reflect the confidence of major aerospace customers in the Debtor's unique capabilities.

The Debtor's management has demonstrated that, given stability and time, they can capitalize on this demand – the company has already begun fulfilling new contracts and ramping up output, as evidenced by the WIP and receivables now on hand, along with the evidence of increased revenue on the face of the Debtor's bank statements. These are clear signs that the Debtor "has shown substantial improvement more recently" in its overall business trajectory.

Crucially, the Debtor has a strategy to monetize these opportunities for the benefit of creditors. The pending § 363 Sale Motion outlines a transaction whereby the Debtor will harness the Aircraft Hinge backlog via the MSA, ensuring that the profits from ongoing and future sales are channeled into the estate (rather than simply servicing inter-company accounts as in the past). By formalizing the Debtor's right to perform and be paid for the backlog, the MSA provides a concrete source of revenue to fund a plan.

Additionally, Aircraft Hinge's involvement as an affiliated entity willing to support the Debtor's restructuring means that the Debtor has access to valuable certifications, customer relationships, and even cash in Aircraft Hinge's accounts to be assigned to Debtor via the MSA. In short, the Debtor is not a failing company grasping at straws – it is a fundamentally sound operation with a niche market, rebounding demand, and a cooperative affiliate, all of which point toward a successful reorganization outcome if the enterprise is allowed to continue operating.

On the other hand, if an injunction is denied and the foreclosure occurs, the Debtor's Chapter 11 case will effectively be dead in the water. The loss of the Property and equipment would force the Debtor to cease operations immediately, causing it to lose its workforce and breach its outstanding orders. Without a facility, the Debtor cannot fill the $5 million in purchase orders, which would likely be canceled or lost to competitors, wiping out that entire source of value. There would be no reorganization – only conversion to Chapter 7 and a fire-sale of remaining assets. This is precisely the outcome that Chapter 11 is designed to avoid when a debtor still has a fighting chance.

Here, the Debtor's chance is not just hypothetical; it is backed by signed purchase orders, tangible progress, and a plan of action via the MSA. The Court should find that the Debtor's likelihood of achieving a successful reorganization (or a successful sale as a going concern) is high enough to merit protection. At the very least, there are serious questions going to the viability of the Debtor's reorganization that justify maintaining the status quo for a limited period. The merits that the Debtor seeks

to vindicate are the merits of its reorganization efforts – efforts which cannot succeed if they are cut short by foreclosure.

In sum, the Debtor has shown a credible prospect of a favorable outcome for creditors and the estate if given time. The issuance of an injunction will effectively allow the Court to decide the Sale Motion (and the Reconsideration Motion) in an environment where reorganization remains possible. This factor weighs heavily in favor of relief, as courts routinely grant § 105 injunctions when doing so is necessary to protect the debtor's chance to reorganize and maximize value for all parties.

### ii. Foreclosure Will Cause Irreparable Harm to the Estate.

Under the second element, Debtor must demonstrate a reasonable likelihood of future injury to obtain a stay.[8] "An irreparable injury is not remote or speculative, but instead is actual and imminent and for which money damages would not be adequate compensation."[9] The Ninth Circuit "require[s] a showing that 'an irreparable injury is the more probable or likely outcome' if the stay is not granted."[10]

The injury that the Debtor and its estate will suffer absent an injunction is immediate, concrete, and irreparable. If PMC is allowed to foreclose on July 1, 2025, the following irreparable harms will occur:

**Loss of the Debtor's Unique Operating Facility and Equipment:** The Property is a specialized manufacturing site with custom-configured machinery (CNC machines, etc.) tailored to producing aircraft hinges. Its location, layout, and permits are integral to the Debtor's operations. Once foreclosed, the Debtor would be evicted and lose access to this facility and all equipment within. Replacing this setup (even if theoretically possible) would require substantial time and capital that the Debtor does not have. The interruption in operations would be effectively permanent. Courts recognize that losing a unique production facility and the accompanying business is irreparable harm, as it cannot be adequately compensated by money damages after the fact.

**Destruction of Going-Concern Value and Business Goodwill:** The Debtor's value as an ongoing enterprise far exceeds the liquidation value of its hard assets. The difference lies in intangibles like customer relationships, goodwill, proprietary know-how, workforce expertise, and certifications. A

---

[8] *See Bank of Lake Tahoe v. Bank of Am.*, 318F.3d 914, 918 (9th Cir. 2003).
[9] *In re Station Casinos, Inc.*, 2010 Bankr. LEXIS 5438, at *14 (Bankr. D. Nev. July 26, 2010).; *In re PTI Holding Corp.*, 346 B.R. 820, 827 (Bankr. D. Nev. 2006) ("Whether there is a 'danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize.'")
[10] *In re Red Mountain Mach. Co.*, 451 B.R. 897, 900 (Bankr. D. Ariz. 2011).

foreclosure and shutdown would destroy these intangibles overnight. Customers with urgent aerospace needs (like the Air Force or major defense contractors) would be forced to find alternate suppliers; in many cases, no immediate replacement exists for the Debtor's capabilities. The Debtor's reputation for being able to deliver critical components on demand – a reputation that won it contracts like the B-52 hinge project – would evaporate. Skilled employees, many of whom have years of specialized experience, would scatter to new jobs, and the Debtor would lose their institutional knowledge. All of these losses are irreparable because once a business is closed and its team disbanded, the prior synergy and goodwill cannot be fully rebuilt. Any later attempt to revive the business (if, for instance, the Debtor somehow regained the property or won an appeal) would be starting from scratch in a greatly diminished position.

**Unrecoverable Loss of the Aircraft Hinge Backlog and Receivables:** The approximately $5 million backlog of purchase orders currently "in the pipeline" would likely be lost for good. Aircraft Hinge's customers are expecting the Debtor to produce those parts. If the Debtor is out of operation, those orders will be canceled or defaulted upon – resulting in lost revenue that the estate can never recapture. Even if another manufacturer could eventually be found, the Debtor's estate would have no privity or benefit. Thus, the estate loses a massive stream of potential income that was within reach. Similarly, the existing WIP ($480k) and any pending receivables ($225k) might never be fully realized; for example, partially completed jobs would remain unfinished and could not be invoiced. These kinds of losses (lost business opportunities and lost prospective revenues that would have funded the estate) are classic forms of irreparable harm in the bankruptcy context, as they directly undermine the estate's value with no realistic remedy.

**Nullification of Reorganization Prospects:** Perhaps most significantly, foreclosure would moot the entire purpose of this Chapter 11 case, robbing not only the Debtor but also its creditors of the chance for a higher recovery. The U.S. Supreme Court and other courts have observed that the ability to reorganize is a central right in bankruptcy, and if actions of a creditor prevent that reorganization, the harm extends to all stakeholders. Here, the elimination of reorganization prospects means unsecured creditors who might have been paid from ongoing operations will instead receive little or nothing in a liquidation. Even PMC itself could be harmed in the long run: as a secured creditor, PMC stands to be paid in full under the Debtor's proposed reorganization plan or sale (which would capitalize on the going concern), whereas a foreclosure might yield only the Property's liquidation value (which, while significant, could be

less than the total combined value of collateral when operating as a business). This kind of harm – the loss of an opportunity to maximize the value of the estate – is irreparable because it cannot be remedied later by monetary compensation or unwinding the foreclosure. Once the assets are liquidated and the business is gone, the chapter 11 case is effectively over.

Courts routinely find irreparable harm in circumstances where, as here, property of the estate is threatened with permanent loss or where the debtor's business will be dismantled absent injunctive relief. The Debtor notes that it has already once used Chapter 11 to prevent a foreclosure on the eve of sale (in October 2024). To allow the foreclosure to proceed now, when the Debtor is on the cusp of a value-preserving transaction, would be to invite the exact collapse that the automatic stay (and by extension § 105 injunctions) is designed to avert. There is no adequate remedy at law for these injuries: PMC's foreclosure might satisfy PMC's debt (or it might not fully, depending on sale price), but no damages or later judicial order can put the Humpty Dumpty of the Debtor's business back together again afterward. Thus, the irreparable harm factor is decisively satisfied.

Moreover, once foreclosure occurs, the harm to the Debtor cannot be unwound. Any appeal or further motion practice would be rendered moot by the loss of estate property and cessation of operations. The Ninth Circuit has repeatedly held that where the absence of interim relief would effectively deprive a party of appellate or post-judgment review, irreparable harm is presumed. *See Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011). The risk here is not hypothetical—it is immediate, concrete, and irreversible.

If a stay is not granted, the Debtor faces the risk of irreparable harm, specifically through the potential loss of the Property via foreclosure. The Ninth Circuit has often recognized that the loss of an interest in real property constitutes irreparable injury because the homeowner cannot be adequately compensated for the loss of the home once it is sold, even if they win on appeal.[11]

### iii. The Balance of Equities Favors the Debtor and the Estate.

In *Nken,* the Court held that a stay maintains the status quo during the pendency of an appeal, halting or postponing enforcement actions until the appellate court resolves the case or controversy on the

---

[11] *See e.g.*, *Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n*, 840 F.2d 653, 661 (9th Cir. 1988); *Park Vill. Apartments Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1159 (9th Cir. 2011).

merits.[12] When weighing the relative hardships, it is clear that the Debtor and its estate would suffer far greater harm from a denial of the injunction than PMC would suffer from its issuance. As detailed above, denial of relief results in the Debtor's collapse and irretrievable loss of value – essentially a worst-case scenario for the Debtor, its employees, and all other creditors.

By contrast, what is the effect on PMC if the injunction is granted? PMC will be delayed in exercising its foreclosure remedy for, at most, roughly six months (through the end of 2025). During this period, PMC's collateral will be protected and maintained. The Property will remain insured and preserved by the Debtor which, as a debtor-in-possession, has every incentive to safeguard the Property and continue using it productively. The value of the collateral is not decreasing; in fact, it is increasing as the Debtor converts raw materials into valuable inventory and fulfills profitable orders.

PMC's secured position is also amply secured by additional collateral beyond just the Property – PMC holds liens on all of the Debtor's personal property and on Aircraft Hinge's assets, and it benefits from Mr. Silva's personal guaranty. These additional cushions mean that PMC is not at significant risk of seeing its recovery dissipate during the injunction period. If the Debtor ultimately fails to reorganize by year-end, PMC can then proceed with foreclosure (or other remedies) with essentially the same (if not better) prospects of repayment as it has today. Moreover, PMC is contractually entitled to accruing interest, default interest, and fees – all of which would presumably continue to accrue during the injunction period, preserving PMC's benefit of the bargain.

The Debtor acknowledges PMC's right to seek adequate protection if needed; however, given the equity cushion in the Property with a scheduled value of approximately $2.2 million vs. a claimed debt around $1.9 million, and the existence of other collateral, the Debtor believes PMC is adequately protected for this short timeframe.

PMC's only real hardship is the delay in enforcement and the opportunity cost of immediate payment. But courts have often held that mere delay in realizing a monetary claim or collateral is not sufficient to outweigh the type of existential harm the Debtor faces. PMC negotiated for a high interest rate (prime + 11.6%, with default rates even higher), presumably as compensation for the risk and time-

---

[12] *Nken*, 556 U.S. at 427-28.

value of money – receiving a few more months of interest instead of immediate principal payment is within the realm of what PMC bargained for.

On the flip side, consider the hardship to the Debtor (and all who depend on it) if the injunction is denied: the Debtor loses everything. Between a delay in payment on the one hand, and corporate death on the other, the balance of equities is not a close call.

It is also worth noting that granting the injunction may ultimately benefit PMC in tangible ways. If the Debtor can consummate the MSA and resume profitable operations, PMC stands to be paid in full rather than having to undertake a foreclosure and possibly litigation to recover any deficiency. PMC's collateral position includes the ongoing business assets – which are far more valuable as part of a going concern than in liquidation.

By preserving the business, the injunction protects the value of PMC's collateral. Indeed, PMC itself chose not to foreclose earlier and entered multiple forbearance agreements, implying that it recognized the potential for greater recovery by working with the Debtor. The equities thus align with giving the Debtor one last opportunity to make good on that potential, rather than allowing a draconian enforcement that yields a one-time fire sale recovery for PMC and nothing for anyone else. In sum, the hardship to be avoided (destruction of the Debtor's enterprise) far outweighs the minimal hardship to PMC of waiting a few additional months for a hopefully larger payoff. Equity favors preservation over destruction, especially in bankruptcy where the goal is to maximize value for all parties.

### iv. A Stay Will Not Harm the Public Interest

In deciding whether to grant preliminary injunctive relief, courts must "pay particular regard for the public consequences . . . ."[13] Granting a temporary stay serves the public interest by preserving the integrity of the judicial process and upholding the fundamental goals of Chapter 11. The Bankruptcy Code is designed to provide debtors with a breathing spell to reorganize, preserve going-concern value, and maximize recoveries for all stakeholders—not to facilitate premature liquidation through procedural shortcuts or avoidable forfeiture. Ensuring that a dispositive post-judgment motion is fully considered before estate property is irreversibly lost aligns directly with that mission.

---

[13] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

Public interest considerations strongly support the issuance of the requested injunction. Congress's intent in Chapter 11 is to encourage reorganization where feasible, as it generally preserves jobs, creates greater recoveries for creditors, and promotes stability in commercial dealings. Granting an injunction here would advance that fundamental bankruptcy policy by giving the Debtor a chance to survive and restructure, rather than rushing to a piecemeal liquidation. The public's confidence in the bankruptcy system is bolstered when courts exercise their equitable powers to protect viable businesses from needless destruction, thereby showing that Chapter 11 can fulfill its purpose of rehabilitation.

Beyond these general bankruptcy principles, the specific facts of this case present compelling public interest factors. The Debtor's operations are tied to the aerospace and defense supply chain of the United States. As noted earlier, the Debtor is "one of only three companies" in the country capable of manufacturing certain critical aircraft hinge components, and some of its products are "directly tied to the national security of the United States." The Debtor has provided essential parts for military aircraft and is certified to work with defense agencies and major aerospace corporations.

The public interest in maintaining domestic industrial capabilities for national defense cannot be overstated. Shuttering the Debtor's facility would remove a key link in that supply chain. For example, when a B-52 bomber was grounded due to a broken hinge, it was the Debtor's company that was able to quickly fabricate the replacement part and get the aircraft back in service. The injunction sought will help ensure that this valuable capability is not lost, at least during the pendency of these Chapter 11 proceedings. Additionally, the local economy and employees have a stake in this outcome. The Debtor provides skilled manufacturing jobs in the Las Vegas area. Many of its employees have long tenures; some even being family members of the owners or second-generation workers. A foreclosure and shutdown would put these individuals out of work immediately. Preserving the business while a reorganization is attempted aligns with the public interest in saving jobs and maintaining the tax base and economic activity in the community.

Finally, issuing the injunction will uphold the public's interest in seeing that justice and fairness are accorded in bankruptcy cases. The Debtor is not seeking to deprive PMC of its rights indefinitely or without cause; it seeks only a temporary injunction to facilitate a fair resolution of pending motions that could benefit all parties. Granting this relief signals that bankruptcy courts will take the necessary steps to protect collective value over individual race-to-foreclosure tactics, which is a foundational principle of the

Code (the automatic stay exists for exactly this reason). Upholding that principle serves the broader public interest by reinforcing the integrity of the bankruptcy process as a collective forum for resolving financial distress. For all these reasons, the public interest factor weighs in favor of granting the injunction. There is a clear societal benefit in allowing a promising reorganization to proceed and preventing the avoidable loss of a company that contributes to national security and the economy.

**B. The Injunction Will Merely Preserve the Status Quo Temporarily (Relief Sought)**

The relief sought is appropriately tailored. The Debtor seeks an injunction through December 31, 2025 (approximately six months), which should provide sufficient time for the Court to rule on the Sale Motion and for the Debtor to either close the contemplated transaction or otherwise arrange for payment of PMC's claim under a plan or sale. If the Debtor's efforts do not materialize within that timeframe, PMC will be free to renew foreclosure proceedings (or the Court can revisit the injunction upon motion). Thus, the injunction is not open-ended; it is a reasonable period designed to align with the Debtor's projected timeline for exiting Chapter 11. During the injunction period, the Debtor will continue to operate and manage the Property in a manner that protects PMC's collateral value. The Debtor is prepared to provide status reports or other accommodations to ensure PMC's interests are monitored and protected. In essence, the injunction will freeze the last major creditor enforcement action long enough to see if this Chapter 11 can achieve a successful resolution. If it can, all stakeholders (including PMC) benefit. If it cannot, PMC's rights will still be intact come 2026, and no party will be worse off than if foreclosure occurred now – indeed, the estate will likely be in a better position for having tried.

**IV.    CONCLUSION AND PRAYER FOR RELIEF**

For the foregoing reasons, the Debtor respectfully requests that this Court enter an order granting the following relief:

    **A. Injunction:** Immediately enjoining PMC Financial Services Group, LLC, and any agents, trustees, auctioneers, or other persons acting in concert with PMC, from conducting the foreclosure sale of the Property located at 2937 N. Lamb Blvd., Las Vegas, NV 89115 (Assessor's Parcel No. 140-18-614-007) currently scheduled for July 1, 2025, and from otherwise taking any act to obtain possession of, or exercise control over, property of the

Debtor's estate pending further order. This injunction shall remain in effect through December 31, 2025, unless modified or dissolved earlier by the Court.

B. **Preservation of Status Quo:** Ordering that the Debtor shall continue to maintain insurance, security, and preservation of the Property and collateral, and shall not transfer or encumber any estate property outside the ordinary course, during the injunction period, except as authorized by further order of the Court (such as any order approving the Sale Motion or other restructuring transactions).

C. **Further Relief:** Granting such other and further relief as the Court deems just and proper to carry out the purposes of this Order, pursuant to 11 U.S.C. § 105(a).

The Debtor submits that the above-requested relief is narrowly tailored to prevent irreparable harm and to promote a successful outcome in this Chapter 11 case. Time is of the essence, and the Debtor respectfully requests that the Court hear this Motion on an expedited basis and thereafter grant the injunction. By doing so, the Court will preserve the value of the estate and uphold the rehabilitative spirit of the Bankruptcy Code, giving the Debtor the opportunity it desperately needs to bring this restructuring to a value-maximizing conclusion.

Respectfully submitted this 27th day of June 2025.

By: */s/ Matthew I. Knepper, Esq.*
**NEVADA BANKRUPTCY ATTORNEYS, LLC**
Matthew I. Knepper, Esq.
*Attorney for Debtor*