Matthew I. Knepper, Esq.
Nevada Bar No. 12796
Brenden J. Gougeon, Esq.
Nevada Bar No. 16874
NEVADA BANKRUPTCY ATTORNEYS, LLC
5940 S. Rainbow Blvd., Ste 400
PMB 99721
Las Vegas, NV 89118
Phone: (702) 660-4228
Fax: (702) 660-4228
Email: mknepper@nvbankruptcyattorneys.com
Email: bgougeon@nvbankruptcyattorneys.com
*[Proposed] Attorneys for Debtor*

E-FILED: 6/27/2025

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In Re: | Case No: 24-15588-abl |
| | Chapter 11 |
| MSHINGES.COM, | |
| Debtor. | Adversary No.: 25-01151-abl |
| MSHINGES.COM, | **DECLARATION OF DOUGLAS SILVA IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| Plaintiff, | |
| v. | **Hearing Date: OST Requested** |
| PMC FINANCIAL SERVICES GROUP, LLC, | **Hearing Time: OST Requested** |
| Defendant. | |

I, Douglas Silva, hereby declare as follows:

1. I am over the age of 18 and am mentally competent. I am the sole officer and shareholder of MSHinges.com, a Nevada corporation, d/b/a Aerospace Machine & Supply, as debtor and debtor in possession (the "Debtor"), and in charge of its day-to-day operation. I am also the sole officer and shareholder of Aircraft Hinge, Inc. ("Aircraft Hinge"), and in charge of its day-to-day operation. In both capacities, I have personal knowledge of all of the Debtor's business and financial affairs, have personal

- 1 -

knowledge of the facts set forth herein, and if called to testify, would do so as stated herein. I make this Declaration in support of Debtor's Emergency Motion for Temporary Restraining Order and for Preliminary Injunction (the "Motion").

2.    The Court and the parties-in-interest to the Motion are familiar with the procedural and factual background in this proceeding, but for the avoidance of doubt I incorporate my Declaration in Support of Debtor's Opposition to the Motion for Relief from Automatic Stay, or Other Relief [2937 N. Lamb Blvd., Las Vegas, NV 89115] (the "Lift Stay Motion"), ECF No. 56, filed by PMC Financial Services Group, LLC ("PMC"). A. The Court's Lift Stay Order

3.    On May 1, 2025, this Court issued its oral ruling granting PMC's Lift Stay Motion under 11 U.S.C. § 362(d)(1), finding that PMC had established cause for stay relief based on a lack of adequate protection ("Lift Stay Order"). ECF No. 75.

4.    In support of this finding, the Court conducted an equity cushion analysis using the Debtor's scheduled value for the real property located at 2937 N. Lamb Blvd. The Court accepted the scheduled real property value of $2,200,000 and subtracted the secured claims of the Clark County Treasurer ($18,658), PrimeSource ($880,000), and PMC itself ($1,904,840.55), resulting in a negative equity position of approximately $603,498.55. The Court concluded that a negative equity position, without more, cannot provide adequate protection under § 362(d)(1). *Id*. at 19-20.

5.    Debtor had argued that its personal property assets also secured PMC's claim and should be considered in evaluating adequate protection. The Court acknowledged this position and factored in the scheduled personal property value of $753,259.96. When this amount was added to the equity calculation, the resulting equity cushion was approximately $149,761.41. However, the Court noted that this figure still fell short of the 20% equity cushion typically required to constitute adequate protection. Moreover, when estimated costs of sale (calculated at 8% of the scheduled property value) were deducted—amounting to $187,980.91—the equity cushion again became negative, with a net position of – $38,219.50. *Id*.

6.    Debtor also argued that the value of the estate as a going concern, including Aircraft Hinge's anticipated revenue, account receivables, and cash on hand provided additional protection for PMC's interest. The Court found this argument unpersuasive based on the record at the time, noting that there was insufficient evidence presented to establish that the ongoing business operations or customer obligations

were generating value sufficient to offset the deficiency in collateral coverage. *Id*. at 12.

7.      Based on these findings, the Court concluded that PMC was not adequately protected and granted relief from stay under § 362(d)(1), allowing PMC to pursue foreclosure of the North Lamb property. *Id*. at 21-22.

B. Debtor Moves for Reconsideration

8.      Following the Court's oral ruling granting relief from stay in favor of PMC Financial Services Group, the Debtor, through prior counsel, filed a Motion to Reconsider pursuant to Federal Rule of Civil Procedure 59(e), as incorporated by Federal Rule of Bankruptcy Procedure 9023.  ECF No. 90.

9.      In the motion, the Debtor contended that the Court's ruling did not give sufficient weight to the broader context of PMC's collateral package, which included not only the North Lamb real property but also substantial personal property—specifically, equipment, inventory, work-in-progress, and accounts receivable. The Debtor argued that this personal property, along with the ongoing operations of the business, constituted a material component of the value securing PMC's claim and warranted further consideration.

10.     The motion emphasized that the Court's equity cushion analysis relied solely on scheduled values that may have understated the true worth of the personal property. The Debtor asserted that the scheduled personal property value of $753,259.96 did not reflect updated information or more accurate asset valuations available at the time of reconsideration.

11.     Additionally, the Debtor argued that the Court should have evaluated the stay relief motion in light of the Debtor's prospects for successful reorganization, supported by the company's backlog of orders, customer relationships, and forward-looking business model. The motion also pointed out that there was no allegation or finding of bad faith or undue delay in the Debtor's use of Chapter 11, and that the loss of the North Lamb facility would irreparably impair reorganization efforts.

12.     Based on these arguments, the Debtor requested that the Court vacate its order granting stay relief and reconsider the matter with the benefit of a more complete evidentiary record and a broader view of the total collateral securing PMC's claim.

13.     During the June 25, 2025 hearing on Debtor's Reconsideration Motion, the Court raised several concerns about the feasibility of Debtor's reorganization in light of the state of its financial affairs as reflected in its Monthly Operating Reports, and the current structure of Debtor and Aircraft Hinge's

business relationship.  C. The Manufacturing Services Agreement

14.    After internalizing the issues raised during that hearing the Debtor's team considered and weighed several options for addressing those concerns and ultimately determined that Debtor and Aircraft Hinge should enter into a Manufacturing Services Agreement ("MSA") that would assign Aircraft Hinge's assets to Debtor, subject to the Bankruptcy Court's approval.  A true and correct copy of the MSA is attached hereto as **Exhibit 1.**  The MSA also features four schedules as follows:

a. **Schedule 1 – Backlog and Verified Purchase Orders**: This schedule consists of the Debtor's current production backlog, listing all customer purchase orders ("POs") that have been received and verified as valid, but not yet completed or delivered. It enumerates each outstanding order (by customer, PO number, and value) that MSHinges will be responsible for fulfilling under the MSA. The backlog represented in Schedule 1 is substantial – in excess of $5 million dollars in aggregate contract value – reflecting the significant demand and work in queue for our aerospace products. These purchase orders have been "verified" to confirm their authenticity and firm status; they are binding orders from customers, not merely estimates or proposals. Schedule 1 thus evidences a key asset the Debtor is acquiring: a pipeline of revenue-generating work that remains to be completed.

b. **Schedule 2 – Work-in-Progress (WIP) Log**: Schedule 2 is a log of all jobs and purchase orders currently in progress on the shop floor. It details each PO that MSHinges (as the manufacturer) is actively working on – including the current production stage or percentage of completion for each order. In essence, this WIP log is a snapshot of ongoing manufacturing activities being performed pursuant to Aircraft Hinge's orders. It overlaps with the backlog[1], but highlights those POs where materials have been issued or work has commenced. By listing each in-progress job, Schedule 2 allows the Court and parties to see how far along various orders are, which parts are being fabricated, and the effort already invested by the Debtor's operation in fulfilling those contracts. All purchase orders identified in the WIP log have likewise been verified as bona fide orders. This schedule helps substantiate the value of the Debtor's in-process work (a component of work in progress inventory) that MSHinges

---

[1] A WIP order is by definition part of the backlog until finished.

will formally take over under the MSA.

c.  **Schedule 3 – Accounts Receivable Aging Report**: Schedule 3 contains an aging report of accounts receivable tied to Aircraft Hinge's purchase orders, particularly those in Schedules 1 and 2. It shows amounts that have been invoiced to customers but not yet collected, categorized by the age of the receivable. Each receivable corresponds to delivered or partially delivered orders under those POs. All the POs associated with these receivables are identified and verified in the schedule. This report is significant because it evidences cash that is contractually owed for work performed – in other words, earned revenue awaiting collection. The receivables are part of the now-existing assets that the MSA assigns to MSHinges, and Schedule 3's aging information illustrates the quality of those assets (e.g. whether the receivables are current or overdue). In summary, Schedule 3 identifies the outstanding customer payments due on account of Aircraft Hinge's orders, which, under the MSA, will become property of MSHinges when collected

d.  **Schedule 4 – Lease Agreement between MSHinges and Aircraft Hinge**: Schedule 4 is a complete copy of the lease agreement by which Aircraft Hinge leases the Debtor's manufacturing facility located at 2937 North Lamb Blvd., Las Vegas, Nevada. This is the MSHinges–Aircraft Hinge lease that has been in place, making Aircraft Hinge the tenant of the property owned by MSHinges. The lease document (Schedule 4) sets forth the terms and conditions of Aircraft Hinge's occupancy of the Lamb Blvd. facility, including the rental obligations. Notably, as discussed later, the MSA provides that instead of paying rent to MSHinges directly, Aircraft Hinge will pay the facility's mortgage obligation to the lender, Fidelity, on MSHinges' behalf, as has been doing since the inception of the Lease Agreement. By attaching the lease, the MSA package fully discloses the landlord-tenant relationship between the Debtor and Aircraft Hinge and ensures the Court is aware of how the real property arrangement is structured in tandem with the services arrangement. Schedule 4 is an executed, authentic copy of that lease agreement, which I have reviewed and which remains in effect.

15.  Attached to my declaration are true and correct copies of exemplar POs with Boeing and HC

- 5 -

Pacific. They can be tied to Schedules 1 – 3 by reference to the Customer PO number. Boeing PO # 2421780 is attached to my Declaration as **Exhibit 2**. HC Pacific PO # 4038700 is attached to my Declaration as **Exhibit 3**. Comparing these POs to any one of Schedules 1-3 will demonstrate that they appear on the face of all three schedules. I have highlighted their respective locations on the Schedules for the Court's convenience.

16. Each of these four schedules is incorporated into the MSA for evidentiary and illustrative purposes, documenting the assets, rights, and relationships that MSHinges will be assuming upon approval of the MSA. I was involved in compiling and/or reviewing these schedules, and I affirm that they accurately reflect the Debtor's backlog, work in progress, receivables, and lease arrangement as of the date of the MSA.

17. The MSA contains several key provisions that formalize MSHinges' economic rights in the Aircraft Hinge orders and clarify MSHinges' operational control over all revenue-generating production. These provisions convert what had been an informal working arrangement into a legally binding framework that ensures the Debtor captures the full value of its manufacturing business. The most critical terms can be summarized as follows:

    a.  **Assignment of Contract Rights and Receivables**: The MSA provides that all contract rights, performance rights, and receivables arising from the Aircraft Hinge customer purchase orders (specifically, those listed in Schedules 1–3) are "deemed irrevocably assigned" to MSHinges. In practical terms, this means that every purchase order held in Aircraft Hinge's name is now, by agreement, economically owned by the Debtor. MSHinges is entitled to all benefits of those contracts – the right to perform the work, to bill for it (through Aircraft Hinge as agent), and to receive the revenue. This assignment is comprehensive and formal, eliminating any doubt that the Debtor (as opposed to Aircraft Hinge) is the party ultimately entitled to the contractual income streams from the backlog of orders.

    b.  **Exclusive Right to Perform the Work**: Hand-in-hand with the assignment of rights, the MSA grants MSHinges the exclusive right and responsibility to manufacture and fulfill all the customer orders covered by the agreement. Aircraft Hinge will no longer utilize any third-party manufacturers or affiliates for those orders during the term of the MSA. MSHinges becomes the sole production source for Aircraft Hinge's contracts. This guarantees that all

revenue-generating production activities flow through the Debtor's operations. It also cements the Debtor's operational control – MSHinges will schedule the work, manage the labor and production process at its facility, and ensure quality and delivery for every order. In effect, the Debtor is formally installed as the manufacturing arm for all current and future POs of Aircraft Hinge in the aerospace components arena. This exclusive engagement is explicitly set forth in Section 1.1 and Section 1.4 of the MSA.

c.    **Aircraft Hinge as Billing and Collection Agent (No Revenue Interest)**: Under the MSA, Aircraft Hinge continues to serve an administrative role – it will remain the customer-facing entity for purposes of issuing invoices, managing customer communications, and collecting payments (since the POs and customer contracts are in Aircraft Hinge's name). However, the MSA makes clear that Aircraft Hinge acts solely as a conduit or agent in this regard, "in furtherance of MSHinges' operational fulfillment of the assigned POs". Critically, Aircraft Hinge waives any beneficial interest in the revenue from those invoices and must hold any funds received in trust for MSHinges. The agreement requires that 100% of the gross proceeds from the customer payments (minus only certain narrowly-defined deductions such as sales tax or direct pass-through costs) be remitted to a Debtor-controlled account.

Specifically, Aircraft Hinge is to deposit all customer payments into its existing account (to avoid disrupting customer routines) but then, within seven (7) business days of receipt, transfer the full amount of each payment to an MSHinges account. In short, the Debtor gets the money from the sales. Aircraft Hinge is not allowed to divert or retain any of the revenue beyond the brief holding period and reimbursement of any agreed direct costs; it must promptly turn over the funds to MSHinges. This process formalizes MSHinges' economic right to the cash generated by the backlog. It is also stated that MSHinges will book all such income on its financials and Monthly Operating Reports filed with the U.S. Trustee, underscoring that these revenues belong to the Debtor's estate. By stripping Aircraft Hinge of any claim to the profits (and treating it purely as a billing agent), the MSA ensures MSHinges has full economic control over the revenue stream from production going forward.

d. **Retention of Title and Control of Goods**: The MSA further provides that MSHinges retains title to all work-in-progress, raw materials, and finished goods related to the Aircraft Hinge orders until the finished product is delivered to the end customer. In other words, even though Aircraft Hinge is the contracting party with the customer, the parts being manufactured are the property of MSHinges while in production. This is a key protection of the Debtor's economic interest: it means that all inventory and WIP associated with those POs is property of the Debtor's estate, and not of Aircraft Hinge, during the manufacturing process. MSHinges is acknowledged as "the performing entity under each PO". This retention of title complements the assignment of contract rights – it leaves no ambiguity that the Debtor owns the products it is making (and therefore the value of the work done) at every stage. Only upon final delivery will title pass to the customer as per the customer contract, but at all times before that, the materials and completed parts are assets of MSHinges.

e. **MSHinges' Operational Autonomy and Remedies**: The MSA formalizes MSHinges' autonomy in operating the manufacturing business. All manufacturing will occur at the Debtor's facility (2937 N. Lamb Blvd) under the Debtor's supervision. Aircraft Hinge will not perform or outsource any of this work elsewhere. If Aircraft Hinge fails to remit payments or otherwise breaches its obligations under the MSA, the agreement provides that MSHinges may terminate the MSA and is entitled to seek injunctive relief or specific performance to enforce the Debtor's rights. These enforcement provisions are important: they give the Debtor legal recourse to protect its economic interests in the POs should Aircraft Hinge not abide by the deal. In sum, the MSA contractually installs MSHinges as the driver's seat operator of the production business (with exclusive manufacturing rights and legal title to work in process) and secures for MSHinges the full financial reward of that business (by assigning all PO rights and requiring all customer funds to flow to the Debtor).

18.     MSHinges' Operational Autonomy and Remedies: The MSA formalizes MSHinges' autonomy in operating the manufacturing business. All manufacturing will occur at the Debtor's facility (2937 N. Lamb Blvd) under the Debtor's supervision. Aircraft Hinge will not perform or outsource any of this work elsewhere. If Aircraft Hinge fails to remit payments or otherwise breaches its obligations under

the MSA, the agreement provides that MSHinges may terminate the MSA and is entitled to seek injunctive relief or specific performance to enforce the Debtor's rights. These enforcement provisions are important: they give the Debtor legal recourse to protect its economic interests in the POs should Aircraft Hinge not abide by the deal. In sum, the MSA contractually installs MSHinges as the driver's seat operator of the production business (with exclusive manufacturing rights and legal title to work in process) and secures for MSHinges the full financial reward of that business (by assigning all PO rights and requiring all customer funds to flow to the Debtor).

19.     It is important to emphasize that the MSA is not yet effective or operative. By its own terms, "no provision of [the MSA] shall be operational or binding unless and until the Bankruptcy Court enters an order approving the Agreement.". The agreement's Effective Date will be the date the Court approves it under 11 U.S.C. § 363 and enters an order to that effect. Until that happens, the MSA is essentially an executory contract pending approval, and its provisions (including the assignment of POs and receivables to MSHinges) are not in force.

20.     This creates a critical interim period in which the Debtor's rights to the backlog, WIP, and receivables – rights that will belong to MSHinges upon approval – need to be protected. Because the MSA has been signed by the parties but is not yet court-approved, MSHinges does not currently have the legal ability to enforce the MSA's terms. For example, right now the purchase orders technically remain with Aircraft Hinge (a non-debtor entity), and the customer payments are still initially going into Aircraft Hinge's accounts. Without the MSA being effective, there is a risk that these assets (the POs, the work, and the proceeds) could be diverted, diminished, or disrupted before MSHinges formally gains control.

21.     In my business judgment, it is essential to preserve the status quo and the value of these assigned rights during this interim period. That is why the Debtor is seeking a Temporary Restraining Order and Preliminary Injunction – to invoke the Court's equitable powers under 11 U.S.C. § 105(a) to maintain these assets and contract rights intact for the estate until the MSA can be approved. The requested injunctive relief will effectively bridge the gap between now and the MSA's Effective Date by preventing any party from interfering with, encumbering, or redirecting the purchase orders and related receivables that are designated to become property of MSHinges.

22.     Without such an injunction, the harms could be irreparable. For instance, if no restraining

order is in place, a creditor of Aircraft Hinge (or Aircraft Hinge itself) might attempt to transfer or encumber the very purchase orders that MSHinges is counting on, or use the receivables for some purpose other than funding the Debtor's operations. In fact, PMC Financial Services Group, LLC ("PMC"), the Debtor's secured lender, also claims a security interest in substantially all assets of Aircraft Hinge. Absent an injunction, PMC could potentially assert control over Aircraft Hinge's incoming payments or contract rights, which would directly undermine the value that the Debtor's estate is supposed to receive under the MSA. Additionally, if Aircraft Hinge were not restrained, it might (hypothetically) choose to fulfill these POs through some other means or delay turning over funds, which would starve MSHinges of the benefit of its bargain.

23.    The injunctive relief will simply maintain the status quo and preserve estate value: Aircraft Hinge will continue operating as it has, but it will be prevented from disposing of or diverting the POs or proceeds that are designated for MSHinges. Essentially, the injunction seeks to lock in the benefit of the MSA for the Debtor now, pending the Court's final approval. This is necessary to ensure that by the time we obtain Court approval, the backlog of orders and the cash generated from them are still there for the Debtor's estate. Given that the MSA is the linchpin of the Debtor's reorganization strategy – formalizing its revenue stream and operational role – any loss of those rights now would cause immediate and irreparable harm to the estate and its creditors.

24.    I want to stress that we are not seeking to implement the MSA without Court approval, but rather to protect the expected fruits of that agreement so they are preserved for the estate. The injunction under § 105(a) is an emergency, stop-gap measure to prevent value from slipping away in the interim. It will ensure that all customer orders, work in process, and incoming payments remain available for MSHinges and are ultimately dealt with as the Court directs upon approval of the MSA. In my view, this relief is crucial to prevent any irretrievable loss of estate assets and to avoid derailing the Debtor's reorganization efforts at this sensitive stage.

25.    For these reasons, I believe the injunction is necessary to preserve the value of the assigned rights and to give the Court the ability to effectively grant meaningful relief when approving the MSA. Once the Court does approve the MSA, MSHinges will immediately step into its role and exercise the rights described above; the TRO/Preliminary Injunction simply ensures that nothing happens in the meantime that

would frustrate that outcome.

26.    By way of background, I would like to describe MSHinges' business and its relationship with Aircraft Hinge, to provide context for why the MSA and injunction are so important. MSHinges (the Debtor) operates a specialized manufacturing business in the aerospace industry. We manufacture standard and custom hinges (hinge pins) and related metal components out of materials like aluminum, titanium, and steel, primarily for use in aircraft. About 60% of our work is for commercial aviation and 40% for military/defense contracts. Our end customers include major aerospace companies such as Boeing and Lockheed Martin, as well as the U.S. Department of Defense and its contractors. All of MSHinges' manufacturing activity occurs at our Las Vegas facility (the Lamb Blvd. property), which houses our machinery, equipment, and skilled workforce (currently about 10 employees). In short, the Debtor is the production hub – we have the physical plant and the personnel to fabricate high-precision hinge assemblies that meet strict aerospace specifications.

27.    Aircraft Hinge, Inc., by contrast, is a separate corporation (based in California) that functions as the sales and contracting arm for this enterprise. Prior to her passing, my wife and I have owned Aircraft Hinge since 1998, and over time we transitioned all manufacturing work from Aircraft Hinge's prior California machine shop to MSHinges' Las Vegas facility. Today, Aircraft Hinge's role is principally to interface with the market: it bids on and secures purchase orders from aerospace and defense customers, handles customer service and contract administration, and then passes the actual manufacturing work to MSHinges. Effectively, Aircraft Hinge is the contracting entity that customers know and contract with, whereas MSHinges is the entity that physically performs the work behind the scenes. This intercompany collaboration has existed for years, albeit without a formal written services agreement until now.

28.    Economically, the relationship historically worked as follows: Aircraft Hinge would invoice the customers for the products manufactured (using its name on the paperwork), collect the payments from customers, and then use those funds to pay the expenses of MSHinges' operations. In my prior declaration to this Court, I described that Aircraft Hinge "collect[s] all monies, and then pays what is needed to maintain the Debtor." That succinctly describes the past practice – the revenue would flow into Aircraft Hinge's bank account, and the Silvas (as principals of both companies) would ensure that MSHinges' costs (payroll, utilities, mortgage, etc.) were paid from those funds. Any remaining amounts could be retained by Aircraft

Hinge as its profit or used for other corporate purposes, since there was no formal obligation at the time to turn everything over to MSHinges.

29.     This arrangement kept MSHinges operational (with Aircraft Hinge effectively funding it), but it also meant that MSHinges itself did not formally report significant revenue or profit, because the sales were booked under Aircraft Hinge. MSHinges functioned almost like a cost center, while Aircraft Hinge was the revenue center. As a result, prior financial statements and bankruptcy reports for MSHinges showed relatively modest cash flow, even though a much larger volume of business was being done when viewed on a consolidated basis with Aircraft Hinge. This dynamic is precisely what the MSA now addresses – by assigning the revenue rights to MSHinges, the Debtor will directly capture the income from the manufacturing work it performs, rather than relying on Aircraft Hinge's informal support. In other words, the MSA realigns the economic relationship so that MSHinges both does the work and gets paid for the work, which will be transparently reflected in MSHinges' own accounts.

30.     It's also worth noting that Aircraft Hinge and MSHinges have a very integrated operational relationship due to common ownership. We share certain resources like the facility (leased to Aircraft Hinge by MSHinges) and even industry certifications. For example, Aircraft Hinge holds an AS9100 certification – the rigorous aerospace quality management standard – which has been extended to cover the Las Vegas production operation as well. In fact, the certification body recognizes our two companies as a unified quality system because of our common management. The MSA acknowledges this by giving MSHinges a license to use Aircraft Hinge's QA certifications for the duration of the agreement. This is vital for compliance: it means MSHinges can present itself as an AS9100-certified manufacturer when dealing with customers and regulators, which is often a prerequisite for aerospace contracts. In practice, Aircraft Hinge brings the contracts and certifications, and MSHinges brings the manufacturing capability and facility. Together, we have been able to service niche aerospace needs – including critical defense-related parts – that few companies in the country can handle.

31.     To illustrate the importance of our operations, one notable example is mentioned in my prior testimony: MSHinges (through Aircraft Hinge's contract) was the only company able to fabricate a replacement hinge for a U.S. Air Force B-52 bomber when a critical hinge broke during flight testing, grounding the aircraft. The original part dated back to 1952, and no other company had the capability or

knowledge to produce it on an urgent timeline. Our team stepped in and manufactured the needed part, directly supporting national security by getting that strategic bomber back in the air. This anecdote underscores that our manufacturing business is not only economically valuable but also strategically significant in the defense supply chain. MSHinges' continuation as a going concern is thus important to customers and the broader aerospace industry, and Aircraft Hinge's collaboration has enabled that work to reach us.

32.     In summary, MSHinges and Aircraft Hinge function as two halves of a single business enterprise: Aircraft Hinge handles customer contracts and billing, and MSHinges performs the manufacturing and owns the production assets. The MSA will formalize this relationship so that it is clear in a legal sense that MSHinges has the primary economic interest and control over the manufacturing work. Operationally, once the MSA is approved, nothing about where or how the work is done will change – all manufacturing will still be done by MSHinges at the Lamb Blvd. facility as it has been for years. The big change will be financial reporting and control of funds: MSHinges will directly receive and account for the revenue, rather than being passively financed by Aircraft Hinge's informal transfers. This clarity and control are essential for the Debtor's successful reorganization (allowing us to propose a feasible Chapter 11 plan funded by our own operations). The injunction we seek simply ensures that this operational and economic framework remains undisturbed and effective during the Chapter 11 case.

33.     The benefits of the closer collaboration between MSHinges and Aircraft Hinge – and the importance of the backlog of orders – have become evident in the financial performance of the Debtor in recent months. We have seen a significant turnaround in revenue and cash flow starting in late 2024 and continuing into 2025, which I can attribute to the influx of work from Aircraft Hinge's purchase orders and the improved coordination of our operations. This is reflected on the face of the Aircraft Hinge's Commercial Bank Account Statements, true and correct copies of which are attached hereto as **Exhibit 4.**

34.     When MSHinges initially filed this Chapter 11 case in late November 2024, its cash position was extremely limited. The Debtor's bankruptcy schedules (filed around that time) reflected that MSHinges had only on the order of a few hundred dollars in its bank accounts as of the petition date. (Specifically, Schedule A/B showed approximately $260 cash on hand, underscoring how depleted the Debtor's coffers were when we sought bankruptcy protection.) This was a result of the prior arrangement – most cash stayed

in Aircraft Hinge – and the general financial distress that led to the filing.

35.    However, beginning in December 2024, there was a marked increase in the Debtor's monthly revenues and account balances. The Commercial Bank Account Statements for the period of October 2024 showed deposits in the total amount of $75,602.50, with an average balance of $24,772.00.  Ex. 4.  In November 2024, our fortunes began to change as the Deposits for that month increased to $141,419.02.  *Id.* Bank statements from December 2024 through the first half of 2025 show that MSHinges began receiving (through Aircraft Hinge's funding of the Debtor) substantially larger deposits, corresponding to the completion and billing of several purchase orders. *Id.* In essence, as Aircraft Hinge secured new contracts and as MSHinges ramped up production after the bankruptcy filing, the Debtor's own bank accounts started to reflect the incoming proceeds. By the end of December 2024, MSHinges had materially more cash on hand than at the start of that month, and this trend continued into January, February, and March 2025, with each month seeing significant customer payments coming in via Aircraft Hinge and being utilized to fund the Debtor's operations. *Id.*  Currently, we have a cash reserve of about $195,000.00 on hand.

36.    One concrete evidence of this financial upswing is the Debtor's ability to service debt and expenses during the case. Starting in January 2025, MSHinges began making monthly adequate protection payments of $15,000 to PMC (the secured lender) and continued to do so for January, February, and March (totaling $45,000 over three months). These payments were roughly equivalent to the monthly interest accruing on PMC's debt, and making them was crucial for the Debtor to stave off aggressive collection actions. In addition, the Debtor (through Aircraft Hinge's assistance) maintained the monthly mortgage payments of about $6,400 to Fidelity for the real estate loan on the Lamb property. All of those payments – over $21,000 per month in aggregate – were actually made from the Debtor's post-petition revenue stream, something that would have been impossible had our cash flow not improved dramatically after filing. The fact that MSHinges could pay both its secured lenders current amounts post-petition, whereas before bankruptcy it was struggling, is a strong indicator of increased liquidity and operational cash generation in the post-December period.

37.    By spring 2025, the Debtor's bank account balances were substantially higher than the near-zero levels of the previous fall. While exact figures are subject to ongoing reconciliation, I can affirm that MSHinges' cash on hand climbed into the five-figure range and continued growing as new payments came

in. This accumulation of cash is directly tied to fulfilling purchase orders (many of which are listed on Schedule 1 and 2 of the MSA). In other words, the backlog identified for assumption by MSHinges is not speculative – it was actively being monetized, and the Debtor's monthly operating reports began to show significant revenues and improving cash balances beginning around December 2024 and thereafter. This is a sharp turnaround from the pre-petition period (and the very early post-petition weeks), where the Debtor's financial reports showed minimal income.

38.    The improvement in financial performance also validates the Debtor's reorganization strategy: by leveraging Aircraft Hinge's contracts and ensuring the work was done through the Debtor, we managed to increase actual cash inflows into the Debtor's estate. It demonstrates that with the backlog of orders in place, the Debtor can generate substantial revenue. For example, the $5 million+ in future purchase orders that Aircraft Hinge had lined up for MSHinges is projected (based on historical gross margins) to yield roughly $1 million to $1.3 million in net income to the Debtor in 2025. The monthly figures we are seeing starting in December 2024 are on track with achieving that level of annual profit. In short, the Debtor has gone from barely subsisting to achieving a healthy operating cash flow in a matter of months, thanks to the consistent workflow provided by Aircraft Hinge and the efficiency of our manufacturing operations.

39.    It is precisely this positive momentum that we seek to preserve with the TRO and preliminary injunction. The Debtor's business is finally hitting its stride, and the numbers prove that out. Our monthly revenues have increased significantly, and we have been using those funds to cover all operating expenses, keep current on critical obligations (like taxes, insurance, payroll), and make the noted adequate protection payments to secured creditors. The balance in the Debtor's accounts at the end of May 2025 was far higher than it was at the beginning of the case, indicating a buildup of reserves that can be used to fund our Chapter 11 plan. This turnaround in financial performance underscores the value of the backlog and receivables – they are the engine driving the Debtor's revival. Any threat to that engine (for example, loss of access to those orders or payments) would derail this progress. Thus, the injunction is not only preserving value in theory, but in practice it is protecting a stream of revenue that is currently revitalizing the Debtor's finances.

40.    In conclusion on this point, the period from October 2024 to May 2025 shows a clear inflection point around December 2024 where the Debtor's revenue trajectory shifted upward. This aligns

with the deeper integration of Aircraft Hinge's business into the Debtor's operations after the bankruptcy filing. We expect this trend to continue, and even accelerate, once the MSA is approved (since all new POs will likewise flow directly through MSHinges). The injunctive relief will ensure that nothing interrupts this positive financial trajectory.

41.    I have previously provided a declaration in support of the Debtor's opposition to PMC's motion for stay relief (filed in March 2025). Many of the factual assertions from that declaration remain highly relevant to the present motion, and I wish to reiterate and, where appropriate, supplement some of those key points here, to emphasize the stakes involved in preserving the Debtor's business via the MSA.

42.    **Unique and Critical Nature of Debtor's Manufacturing Business**: MSHinges' operation is a vital part of the aerospace and defense supply chain in the United States. We are a small company, but we occupy a niche with outsized importance. In some cases, as mentioned, we are one of only a handful of companies (sometimes only three nationwide) capable of fabricating certain aircraft hinge components to the required specifications. Our products can directly impact national security and military readiness (for example, the B-52 bomber hinge scenario). The Debtor's continued operation is not just about preserving value for creditors; it is also about ensuring that critical aerospace manufacturing capacity is maintained. The Court itself recognized the significance of the Debtor's business in prior hearings, and this weighs in favor of granting relief that allows the Debtor to remain operational and fulfill its government and commercial contracts. Shutting down or losing the Debtor's productive assets would have consequences beyond this bankruptcy case, potentially affecting defense contracts and customers who rely on our specialized capabilities. I state this to underscore that the Debtor's business has substantial intrinsic value and importance, which the Court has been made aware of and which should be protected.

43.    **Value of the Debtor's Tangible and Intangible Assets**: As detailed in my prior declaration and the Debtor's bankruptcy filings, MSHinges owns significant assets that form the backbone of its operations. The principal asset is the Lamb Blvd. real property (the manufacturing facility), which the Debtor recently valued at approximately $2.2 million based on a recent purchase offer we received. The Debtor also holds roughly $753,000 worth of machinery, equipment, and other personal property (tools, inventory, etc.) used in the business. These figures were disclosed in our Schedule A/B and reflect a conservative estimate of the asset values. Additionally, although Aircraft Hinge is not part of the bankruptcy estate, it possesses

assets that are highly relevant to the Debtor's value because they are being leveraged by the Debtor. For instance, Aircraft Hinge owns extensive intellectual property, technical drawings, customer lists, and software licenses related to the hinge products, which were estimated to be worth at least $500,000. These intangible assets are effectively being contributed to the Debtor's operations (Aircraft Hinge has allowed MSHinges to use them freely for manufacturing purposes). Under the MSA, any such intellectual property or certifications needed to perform the services are licensed to MSHinges for its use. Thus, the Debtor benefits from Aircraft Hinge's intangible asset base, enhancing the value of the Debtor's overall enterprise.

44.     **Size and Significance of the Backlog (Future Orders)**: The backlog of purchase orders that Aircraft Hinge has in hand – which MSHinges will perform and derive revenue from – is both large and valuable. As noted earlier, Aircraft Hinge has in excess of $5,000,000 in customer orders lined up for production by the Debtor. This backlog is the lifeblood of the business going forward. Based on historical margins, we anticipate that fulfilling these orders will generate on the order of $1 million to $1.3 million in net profit for the Debtor over the course of 2025. In my previous declaration, I highlighted this backlog as a major component of adequate protection for our secured creditor (PMC) – because it represents significant value and earning potential that secures their claim. The Court was made aware that PMC's collateral package effectively includes not just the real estate, but all this ongoing business value (since PMC also claims a lien on Aircraft Hinge's assets including its POs). Preserving the backlog is therefore critical for all stakeholders: it is the source of funds to pay creditors and the key to a successful reorganization. If those orders were lost or went unfulfilled, the estate would be deprived of an opportunity to realize their multi-million dollar value. Every effort must be made to protect and complete the backlog. The MSA and the requested injunction are exactly such efforts – they lock in the backlog for the Debtor's benefit. I reaffirm that this backlog is real, it's funded by valid government and corporate contracts, and it provides tremendous upside to the estate if we can retain it and execute it properly.

45.     **Going-Concern Value vs. Liquidation**: Implicit in the above points is the understanding that MSHinges has far more value as an operating enterprise than it would in liquidation. Debtor's balance sheet at the start of the case suggested roughly $3 million of tangible assets (real estate + equipment) against secured debt of a similar magnitude – a scenario that fueled PMC's push for stay relief on the property. However, the enterprise value including the ongoing business, backlog, and synergy with Aircraft Hinge,

changes the picture completely. The Debtor's ability to generate over $1 million in annual profit (as projected) and to pay creditors in full over time is what justifies keeping this company intact. I stated in March 2025 – and continue to believe – that with a reasonable time, Aircraft Hinge and the Debtor's operations together can pay Fidelity and PMC in full and service all claims. That confidence rests on the continuation of the business as a going concern, harnessing the value of the backlog and the Debtor's unique capabilities. It is therefore essential to reiterate: the value of MSHinges is not just in its fixed assets, but in its operations and contracts. The Court's rulings and guidance thus far have recognized this broader value (for instance, questioning how the Debtor could realize that value for the estate). The relief now sought is in direct response to that, aiming to preserve and maximize the true value of the Debtor's business for the benefit of all creditors.

46.     Incorporating these points into the current context, I want to make it clear that all the factual foundations I laid in my prior declaration remain true and, if anything, the passage of a few more months has only strengthened the evidence for them. The Debtor's business is critical and irreplaceable in its niche; its assets (both on-book and off-book via Aircraft Hinge) are substantial; and the backlog of work is a valuable asset that we are actively converting into cash. All of these facts support the Debtor's request for injunctive relief and eventual approval of the MSA – because they demonstrate that preserving and formalizing the Debtor's control over its operations will yield significant value and avoid irreparable harm. Conversely, if the Debtor were to lose its facility or the rights to perform those orders (for lack of an injunction or otherwise), it would destroy much of this value and harm not just the Debtor but customers and creditors alike. I therefore restate these facts under penalty of perjury to reinforce the equitable case for granting the Debtor's motion.

47.     Finally, I wish to address how the MSA and the accompanying lease structure have been designed to align with the Court's concerns expressed during recent hearings (specifically, the hearings on the motion to reconsider stay relief and on the Disclosure Statement). The Court in those proceedings inquired pointedly about the relationship between MSHinges and Aircraft Hinge – essentially asking how the Debtor would ensure that it (and its creditors) benefit from the ongoing operations, and questioning whether the lack of a formal agreement or the intercompany lease might be obscuring the true financial picture. We took the Court's comments to heart in formulating the MSA and related agreements.

48.     **First, to confirm the status of the lease**: Aircraft Hinge is indeed the lessee of the Lamb Blvd. property, pursuant to a lease agreement with MSHinges that predates the bankruptcy. MSHinges is the owner/landlord of the facility, and Aircraft Hinge has been renting it for its operations (which are effectively our combined operations). This lease is the document attached as Schedule 4 to the MSA, so the Court has full transparency on that arrangement. During the hearing on the Reconsideration motion, the Court raised the question of who owned the lease, thus raising the issue of whether the Debtor was receiving appropriate value or consideration from Aircraft Hinge for the use of the building.

49.     Under the existing lease, Aircraft Hinge was obligated to pay rent, which was generally set at a level to cover the Debtor's mortgage payments. In practice, as mentioned, Aircraft Hinge has been paying the mortgage directly to the lender (Fidelity) on behalf of MSHinges, in lieu of paying traditional rent each month. The MSA explicitly continues this arrangement: it states that Aircraft Hinge will pay the mortgage obligation on the Lamb property directly to Fidelity rather than sending rent to MSHinges, and that MSHinges will accordingly book that as lease income on its reports. The reason for this approach is to ensure the mortgage (which is senior debt on the property) is kept current for the benefit of the estate, while simplifying the cash flow (no need for money to loop through MSHinges just to go to the bank). Importantly, this satisfies the Court's concern that the Debtor's real property asset be protected and used to the estate's advantage – because Aircraft Hinge is effectively contributing the funds to preserve the property (by paying the mortgage) during the Chapter 11. There is no lease payment money being siphoned off elsewhere; it's going straight to maintain the estate's principal asset.

50.     **Second, formalizing the revenue flow**: The Court also expressed concern about how the Debtor's estate would capture the profit from ongoing business given that Aircraft Hinge was the entity billing customers. The MSA squarely addresses this by legally assigning the revenue to MSHinges and requiring all of it to be turned over promptly. This directly responds to what I understood to be the Court's question: "How do we know the Debtor is getting the benefit of the work it's doing?" After the MSA (with Court approval), the answer will be: because the contracts and dollars are contractually made property of the Debtor. We have taken what was a murky, informal arrangement and codified it into a clear legal structure where MSHinges' rights are predominant and enforceable. The Court was understandably concerned that without such formalization, Aircraft Hinge's activities could be viewed as siphoning value

from the Debtor or creating a risk that the estate wasn't realizing the full worth of its business. Now, with the MSA in place (subject to approval), those concerns should be allayed: every piece of meaningful value (the backlog, the WIP, the A/R) that historically sat with Aircraft Hinge is being brought into the Debtor's fold. And every dollar that Aircraft Hinge collects going forward will be either passed to the Debtor or accounted for as a necessary cost, with complete transparency to the Court and creditors.

51.    **Third**, **respecting corporate separateness while maximizing value**: During the hearings, the Court also highlighted the need to maintain proper distinctions between the Debtor and its affiliate, even as we coordinate them. The MSA is crafted with provisions acknowledging the common ownership but separate corporate existence of MSHinges and Aircraft Hinge. It expressly disclaims any intent to merge the two entities or to retroactively consolidate them. Both companies will continue to maintain separate books, records, bank accounts, and corporate formalities (absent a substantive consolidation order, which is not being sought). This was included to address any concern the Court had about the propriety of the two companies working hand-in-glove. We wanted to show that we can achieve the goal of channeling the economic value to the Debtor without violating corporate boundaries or creditor rights. In fact, by formalizing everything in the MSA and lease, we enhance transparency – creditors can now see the exact terms by which the Debtor and Aircraft Hinge operate together, rather than having to guess at an informal understanding.

52.    **Fourth, alignment with Court's guidance on plan feasibility**: During the hearing on the Reconsideration Motion: the Court indicated that any plan of reorganization must clearly demonstrate the Debtor's ability to fund payments to creditors, and that would likely require incorporating the Aircraft Hinge relationship. The MSA and its schedules provide the foundation for the Debtor's plan: they show the backlog of work and the assignment of its proceeds to the Debtor, which in turn shows how the Debtor can afford to pay claims over time. Essentially, the Court was concerned that, on paper, MSHinges alone didn't have enough income to service the debt – so we have now brought Aircraft Hinge's income on-paper into MSHinges (prospectively). This structure is exactly what will be reflected in the amended disclosure statement and plan projections: MSHinges will have the revenue from all those purchase orders to fund the plan. In this way, the MSA and lease directly respond to and implement the Court's feedback on ensuring a confirmable plan structure. In summary, the combination of the MSA and the existing lease (as modified by

the MSA's terms) is carefully calibrated to address the Court's prior concerns. We are aligning incentives and obligations such that: (a)The Debtor's property (Lamb Blvd.) is being utilized to generate value (via the manufacturing work) and is being preserved (via direct mortgage payments) for the estate; (b) the Debtor is receiving full economic benefit of its production, ensuring creditors are not prejudiced by value slipping to a non-debtor; (c) The arrangement is transparent and subject to Court oversight – any significant intercompany transactions (e.g., if Aircraft Hinge subsidizes a capital expenditure, as allowed in MSA) must be documented, and all these operational results will appear in MSHinges' U.S. Trustee reports; (d) we respect the separate corporate form of each entity while achieving a unified operational result. This means creditors of MSHinges only gain (because MSHinges is getting more assets and income assigned to it) without any creditor of Aircraft Hinge being improperly harmed (since this is done with Aircraft Hinge's agreement and for the purpose of maximizing the enterprise value that also supports Aircraft Hinge's obligations such as to PMC).

53.    I firmly believe that the MSA and lease structure now before the Court is in line with what the Court was urging the Debtor to do: formalize the relationship, protect the estate's interest, and be transparent about it. The Court's guidance has been followed to the letter – we have a written contract, disclosed schedules, and a motion for approval under § 363. The final piece to make this effective is the Court's approval and, in the interim, an injunction to hold everything in place. With those in hand, the Debtor will be able to operate confidently under the Court-approved structure, generate significant value, and propose a confirmable plan that pays creditors in full or otherwise satisfies the Bankruptcy Code's requirements.

///

54.     In conclusion, I want to express that granting the requested TRO and preliminary injunction will directly support the Court's prior concerns and objectives: it will maintain the integrity of the Debtor's estate, ensure that the Debtor's assets (tangible and intangible) are used to maximum benefit, and prevent any maneuvering that could undermine the Court's eventual rulings on the reorganization. Everything we have done in structuring the MSA and related arrangements has been with an eye toward aligning with the Court's comments and achieving a fair outcome for all parties. I respectfully ask that the Court grant the injunctive relief so that the estate and its creditors are protected during this critical period while we move towards approval of the MSA and confirmation of a plan.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 27, 2025,

/s/ *Douglas B. Silva*
Douglas B. Silva as sole manager of the Debtor and as
Sole manager of Aircraft Hinge.